UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

| | | |
|---|---|---|
| NAKED COWBOY, d/b/a Naked Cowboy Enterprises, | : | Index No. 11-CV-0942 (BSJ) |
| | : | |
| Plaintiffs, | : | ECF Case |
| -against- | : | |
| CBS and BELL-PHILLIP TELEVISION, | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS THE COMPLAINT**


Robert Penchina
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
321 W. 44th Street, Suite 510
New York, NY 10036
(212) 850-6100

*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................ii

STATEMENT OF FACTS....................................................................................... 2

ARGUMENT .......................................................................................................... 5

I.    BURCK DID NOT AND CANNOT STATE A
      CLAIM UNDER THE LANHAM ACT ........................................................ 5

      A.    Defendants Made No Trademark Usage of
            Anything Belonging to Burck ......................................................... 7

      B.    Depiction of a Similarly Dressed Character and the Titling of
            a Video Clip Are Protected Under the First Amendment.................... 11

      C.    Defendants' Activities Pose No Likelihood of Confusion.................... 14

II.   BURCK DID NOT AND CANNOT STATE A CLAIM UNDER STATE
      DECEPTIVE PRACTICES OR FALSE ADVERTISING LAW ................... 21

III.  BURCK'S CLAIM UNDER NEW YORK CIVIL RIGHTS LAW §§ 50
      and 51 IS FRIVOLOUS ............................................................................... 22

IV.   BURCK'S FRAUD CLAIM IS FRIVOLOUS................................................ 24

CONCLUSION ...................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*1-800 Contacts, Inc. v. WhenU.Com, Inc.,*
  414 F.3d 400 (2d Cir. 2005) .................................................................. 6

*24 Hour Fitness USA, Inc. v. 24/7 Tribecca Fitness, LLC,*
  447 F. Supp. 2d 266 (S.D.N.Y. 2006), *aff'd*, 247 F. App'x 232 (2d Cir. 2007) ................... 18

*Anti-Monopoly, Inc. v. General Mills Fun Group,*
  611 F.2d 296 (9th Cir. 1979) ................................................................. 7

*Arnold v. ABC,*
  2007 WL 210330 (S.D.N.Y. Jan. 29, 2007) .................................................. 6, 8

*Arrington v. N.Y. Times Co.,*
  55 N.Y.2d 433, 449 N.Y.S.2d 941 (1982) .................................................... 23

*Arrow Fastener Co. v. Stanley Works,*
  59 F.3d 384 (2d Cir. 1995) ................................................................. 15

*Avon Products, Inc. v. S.C. Johnson & Son, Inc.,*
  984 F. Supp. 768 (S.D.N.Y. 1997) ........................................................ 21, 22

*Brockmeyer v. Hearst Corp.,*
  248 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................................................ 18

*Burck v. Mars, Inc.,*
  571 F. Supp. 2d 446 (S.D.N.Y. 2008) ..................................................... 2, 22, 23

*Charles Atlas, Ltd. v. DC Comics, Inc.,*
  112 F. Supp. 2d 330 (S.D.N.Y. 2000) ................................................... passim

*Chum Ltd. v. Lisowski,*
  198 F. Supp. 2d 530 (S.D.N.Y. 2002) ...................................................... 17, 20

*Citrus Grp., Inc. v. Cadbury Beverages, Inc.,*
  781 F. Supp. 386 (D. Md. 1991) ............................................................. 10

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.,*
  886 F.2d 490 (2d Cir. 1989) ............................................................... 12, 13

*Corning Glass Works v. Jeannette Glass Co.,*
  308 F. Supp. 1321 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970) ........................... 21

*Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.,*
   125 F.3d 28 (2d Cir. 1997) ................................................................. 8, 9, 11, 19

*Costanza v. Seinfeld,*
   279 A.D.2d 255, 719 N.Y.S.2d 29 (1st Dep't 2001) ........................................... 24

*ETW Corp. v. Jireh Publishing, Inc.,*
   332 F.3d 915 (6th Cir. 2003) ............................................................... 7, 12

*Girl Scouts of the U.S.A. v. Bantam Doubleday Dell Publishing Group, Inc.,*
   808 F. Supp. 1112 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 1477 (2d Cir. 1993) ...........11, 12, 15, 16

*Gruner + Jahr USA Publishing v. Meredith Corp.,*
   991 F.2d 1072 (2d Cir. 1993) ............................................................. 16, 19

*GTFM, LLC v. Universal Studios, Inc.,*
   2006 WL 1377048 (S.D.N.Y. 2006) .............................................................6

*Gucci America, Inc. v. Action Activewear, Inc.,*
   759 F. Supp 1060 (S.D.N.Y. 1991) ............................................................. 21

*Hampton v. Guare,*
   195 A.D.2d 366, 600 N.Y.S.2d 57 (1st Dep't 1993) ........................................... 23

*Hormel Foods Corp. v. Jim Henson Productions, Inc.,*
   73 F.3d 497 (2d Cir. 1996) ................................................................... 18

*L.L. Bean, Inc. v. Drake Publishers, Inc.,*
   811 F.2d 26 (1st Cir. 1987) ................................................................... 11

*Lang v. Ret. Living Publishing Co.,*
   949 F.2d 576 (2d Cir. 1991) ............................................................... 18, 19

*Le Book Publishing, Inc. v. Black Book Photography, Inc.,*
   418 F. Supp. 2d 305 (S.D.N.Y. 2005)............................................................2

*Lemerond v. Twentieth Century Fox Film Corp.,*
   No. 07 Civ. 4635, 2008 WL 918579 (S.D.N.Y. 2008) ........................................... 24

*Lemme v. NBC,*
   472 F. Supp. 2d 433 (E.D.N.Y. 2007)...................................................... 17, 20

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
   454 F.3d 108 (2d Cir. 2006) ................................................................... 21

*M.B.H. Enterprises Inc. v. WOKY, Inc.,*
   633 F.2d 50 (7th Cir. 1980) ................................................................... 15

*Mattel, Inc. v. Walking Mountain Productions*,
   353 F.3d 792 (9th Cir. 2003) ................................................................... 12

*Merck & Co. v. Mediplan Health Consulting, Inc.*,
   425 F. Supp. 2d 402 (S.D.N.Y. 2006) ....................................................... 21

*Messenger ex rel. Messenger v. Gruner + Jahr Printing & Publishing*,
   94 N.Y.2d 436, 706 N.Y.S.2d 52 (2000) .................................................. 23

*Motown Productions., Inc. v. Cacomm*,
   668 F. Supp. 285 (S.D.N.Y. 1987), *rev'd on other grounds*, 849 F.2d 781 (2d Cir.
   1988) ........................................................................................................ 20

*Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.*,
   2009 WL 4857605 (S.D.N.Y. 2009) .......................................................... 21

*Parker v. Viacom International, Inc.*,
   605 F. Supp. 2d 659 (E.D. Pa. 2009) ...................................................... 8, 9

*Pirone v. MacMillan, Inc.*,
   894 F.2d 579 (2d Cir. 1990) ................................................................... 7, 8

*Polaroid Corp. v. Polarad Electronics Corp.*,
   287 F.2d 492 (2d Cir. 1961) ..................................... 15, 16, 18, 19, 20

*Premium Mortgage Corp. v. Equifax, Inc.*,
   583 F.3d 103 (2d Cir. 2009) ..................................................................... 24

*Rin Tin Tin, Inc. v. First Look Studios, Inc.*,
   671 F. Supp. 2d 893 (S.D. Tex. 2009) ...................................................... 10

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ................................... 11, 12, 13, 14, 15

*Schad v. Borough of Mount Ephraim*,
   452 U.S. 61 (1981) .................................................................................... 13

*Seale v. Gramercy Pictures*,
   949 F. Supp. 331 (E.D. Pa. 1996) ............................................................ 13

*Sira v. Morton*,
   380 F.3d 57 (2d Cir. 2004) ......................................................................... 2

*The Deal, LLC v. Korangy Publishing, Inc.*,
   309 F. Supp. 2d 512 (S.D.N.Y. 2004) ...................................................... 15

*Twin Peaks Productions, Inc. v. Publications International, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993) ....................................................... 12, 15, 20

*Volkswagen AG v. Dorling Kindersly Publishing, Inc.,*
   614 F. Supp. 2d 793 (E.D. Mich. 2009) ........................................................... 7, 10

*Walter v. NBC Television Network,*
   27 A.D.3d 1069, 811 N.Y.S.2d 521 (4th Dep't 2006) ..................................... 23, 24

*Western Publishing Co. v. Rose Art Industries, Inc.,*
   910 F.2d 57 (2d Cir. 1990), *superseded on other grounds by Paddington Corp. v.*
   *Attiki Importers & Distributors, Inc.,* 996 F.2d 577 (2d Cir. 1993) ...................... 18

*Windsor, Inc. v. Intravco Travel Centers, Inc.,*
   799 F. Supp. 1513 (S.D.N.Y. 1992) ................................................................ 15, 19

*Yankee Publishing, Inc. v. News America Publishing Inc.,*
   809 F. Supp. 267 (S.D.N.Y. 1992) ............................................................ 7, 12, 22

**STATUTES**

15 U.S.C. § 1114 ................................................................................................. 5, 6

15 U.S.C. § 1115 ..................................................................................................... 11

15 U.S.C. § 1125 ..................................................................................... 5, 6, 8, 21

N.Y. Civ. Rights Law § 50 ............................................................................ 22, 23, 24

N.Y. Civ. Rights Law § 51 ............................................................................ 22, 23, 24

N.Y. Gen. Bus. Law § 349 .................................................................................... 21

N.Y. Gen..Bus. Law § 350 .................................................................................... 21

N.Y. Gen. Bus. Law § 360-I .................................................................................. 21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) .............................................................................................. 24

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 1, 6

Defendants CBS Broadcasting Inc. ("CBS") (erroneously sued herein as "CBS") and Bell-Phillip Television Productions, Inc. ("Bell-Phillip") (erroneously sued herein as "Bell-Phillip Television"), hereby respectfully move for an order, pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissing all claims asserted against them by Robert John Burck ("Burck"), holder of a trademark registration for the mark "Naked Cowboy." This case arises in connection with an episode of the daytime serial *The Bold and the Beautiful* produced by defendant Bell-Phillip and broadcast by defendant CBS (the "Episode"). The Episode included a storyline featuring interplay between characters named Oliver and Amber, and included a scene in which Oliver attempted to charm Amber by singing to her while playing a guitar and wearing just his hat, briefs and boots. Burck alleges that this Episode somehow infringed and diluted his trademark rights in the word mark "Naked Cowboy," and has asserted a variety of state and federal law claims challenging the content of the Episode. But, the words "naked cowboy" are not spoken, displayed or otherwise mentioned in the Episode. Moreover, even if the Episode had referred in some fashion to the Naked Cowboy character for which Burck is known, such use is fully protected by the First Amendment. Burck also challenges a title used to identify a video excerpt from the Episode, notwithstanding that such titles also are protected by the First Amendment. He also asserts a right of publicity claim attempting to protect the fictional character he portrays notwithstanding that a Court in this district expressly has ruled that New York's right of publicity statute *does not apply* to Burck's Naked Cowboy character. Finally, Burck asserts a claim for fraud based on what he surmises an audience might perceive about him based on a character in the Episode, notwithstanding that he himself knew this speculation was not true, and he did not and could not act in reasonable reliance on the supposedly fraudulent message. In short, the Complaint is completely meritless and should be dismissed.

## STATEMENT OF FACTS

The following facts are alleged in the Complaint and are accepted as true solely for the purposes of this motion. Defendants do not accept legal conclusions in the Complaint as true.

Burck, who refers to himself as the "Naked Cowboy," is a street performer who "dresses as a cowboy—only a virtually Naked one." Compl. ¶ 9. He "dress[es] up in: briefs; cowboy boots; a cowboy hat; and [carries] a guitar." *Id.* On his briefs, the name "'Naked Cowboy' [is] hand painted on his butt in red and blue." *Id.* Ex. B. Likewise, the words "Naked Cowboy" are emblazoned on his white hat and blue or white guitar. *See* Penchina Dec. Exs. A-B[1]; *see also, e.g., Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 448 (S.D.N.Y. 2008) (displaying photograph of Burck). And, the word "Tips" or the symbol "$" is painted on his cream-colored boots. *See* Penchina Dec. Exs. A-B. So attired, Burck "meet[s] and greet[s] the public in New York City's Times Square." Compl. ¶ 9. He also "performs in Times Square for NYC and The Times Square Alliance as part of their ongoing series 'Grate Performances' which are organized street performances to entertain tourists and visitors to Times Square." *Id.* ¶ 11. He "can be seen on any given day in Times Square." *Id.* Ex. B.

---

[1] In deciding a motion to dismiss, a court may consider "materials incorporated [into the complaint] by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). Among other documents, the Complaint expressly references Burck's website. Compl. ¶ 15. Moreover, by putting an episode of *The Bold and the Beautiful*, the "Clarence B&B Update," and YouTube postings at issue (*see* Compl. ¶¶ 22, 34-37), the contents of that program and those postings are necessarily incorporated by reference and are integral to the Complaint, and may be considered on a motion to dismiss. *See, e.g., Le Book Pub'g, Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 308 (S.D.N.Y. 2005) (on motion to dismiss trademark and copyright claims relating to competing directories, "[b]oth directories . . . may be considered because they are referenced in the complaint and are crucial to plaintiff's claims"). Screenshots of Burck's website are submitted herewith as exhibits to the Declaration of Robert Penchina; copies of the November 2, 2010 episode of B&B and the November 5, 2010 "Clarence B&B Update" are submitted as exhibits to the Declaration of Ronald L. Weaver; and copies of the video excerpt and screenshot of the YouTube posting at issue are submitted as exhibits to the Declaration of Corey Downs.

Burck holds U.S. Trademark Registration No. 3,792,432 for the word mark "Naked Cowboy." *Id.* ¶ 16. He has licensed that mark for use in connection with "T-Shirts, Postcards, Keychains, Shot Glasses, Music CDs, [and] Pencils," which are "available from vendors throughout New York City." *Id.* ¶ 18. He also has licensed the mark to Blue Island Shellfish Farms, which has distributed "Naked Cowboy Oysters throughout New York." *Id.* ¶ 19.

Bell-Phillip is the producer of *The Bold and the Beautiful* ("B&B"), a thirty-minute daytime series broadcast by CBS. *Id.* ¶ 21. B&B is a fictional drama that centers on the Forrester family and their fashion business known as "Forrester Creations." *See* Weaver Dec. Ex. A. Each episode of B&B prominently features opening and closing credits that identify defendants as the source of B&B. *See id.* Among other things, Bell-Phillip's well-known "B&B" logo is displayed during the opening credits, and the closing credits prominently identify "Bell-Phillip Television Productions, Inc." in bold letters taking up much of the screen. *See id.* The closing credits also identify "CBS Television City" and display the famous CBS "Eye" logo. *See id.*

The November 2, 2010 episode of B&B featured a storyline involving an encounter between the characters Amber Moore and Oliver Jones. *See id.* Amber, a fictional designer in competition with Forrester, poured drinks for Oliver, hoping he would fall asleep and thus give Amber an opportunity to access and copy some Forrester designs from Oliver's touch-pad computer. *See id.* Oliver, however, had his own amorous designs on Amber, and he beckoned her to his room. *See id.* When she arrived, he attempted to charm her by singing a song he made up on the spot, performing it on a light-brown guitar while wearing a tan hat, brown boots and underwear. *See id.*

3

The Oliver character appeared on screen with his hat, boots, underwear and guitar for a total of less than ten seconds, and with just his hat, boots and underwear for another three seconds. *See id.* Although frequently shown fully clothed or shirtless at other times during the Episode, he does not appear again with a hat, boots, underwear and a guitar. *See id.* At all times, it was clear that the actor playing Oliver was portraying the character "Oliver," and was not presenting himself to the audience as Burck or anyone else. *See id.* The words "naked cowboy" were not mentioned in the scene or anywhere in B&B—they were not displayed on Oliver's underwear, hat or guitar, they were not written or spoken during the show, and simply were not present in any form. *See id.*

The "Clarence B&B Update" is a video feature of *The Bold and the Beautiful* website, in which Bell-Phillip, on a weekly basis, provides a recap of what happened on the show during the just-ended week. *See* Compl. ¶ 27; Weaver Dec. Ex. B.  The November 5, 2010 Clarence B&B Update recapped the episodes that aired from November 1 to November 5, including the interaction between Amber and Oliver described above. *See* Compl. ¶ 27; Weaver Dec. Ex. B. The recap included a less-than 8-second clip showing Oliver with his hat, boots, underwear and guitar. *See* Weaver Dec. Ex. B.  Like B&B itself, the Clarence B&B Update does not mention or otherwise include any reference to the words "Naked Cowboy." *See id.* At all times during the Clarence B&B Update, Bell-Phillip's "B&B" logo is prominently displayed on screen, designating Bell-Phillip as the source of the video. *See id.;* Compl. Ex. H.

Bell-Phillip posted the November 5 Clarence B&B Update on the B&B YouTube channel and CBS posted a clip of the November 2 B&B episode on CBS' YouTube channel. Compl. ¶ 30. CBS "title[d] [its] video clip version of the episode on youtube, 'The Bold and the Beautiful – Naked Cowboy.'" *Id.* ¶ 34. The YouTube page prominently identified CBS as the source of

4

the video, and displayed the famous "CBS" and CBS "Eye" logo marks as source identifiers. Downs Dec. Ex. B; Compl. Ex. E.  The clip was captioned "Oliver has a surprise for Amber." Downs Dec. Ex. B; Compl. Ex. E.  In addition, the clip itself displays the identifiers "CBS.com" and the CBS "Eye" logo at the end of the video.  *See* Downs Dec. Ex. A.

In addition to titles and captions, YouTube postings generally include "tags"—which are single words that describe the video which aid users when they search for content.  *See, e.g.,* Compl. ¶ 37 & Ex. H.  The YouTube page on which the Clarence B&B Update was displayed contained more than thirty descriptive tags, such as "Oliver," "Amber," "shirtless," and "underwear," and included the single words "naked" and "cowboy."  *Id.* Ex. H.

Burck initiated this case on February 14, 2011.  As demonstrated below, all of his claims are without merit.

## ARGUMENT

I. **BURCK DID NOT AND CANNOT STATE A CLAIM UNDER THE LANHAM ACT**

Burck's First through Fourth Causes of Action purport to assert claims for trademark infringement and dilution, false designation of origin, and false description under the Lanham Act, all based on the idea that defendants made use of the "Naked Cowboy" trademark.[2]  *See, e.g.,* Compl. ¶¶ 48 ("Defendants' . . . use of 'Naked Cowboy' in the manner described comprises an infringement of Naked Cowboy's registered trademark"); 64 ("Because of Defendants' wrongful use of the name Naked Cowboy . . . ."); 66 ("Defendants' use of the Naked Cowboy

---

[2] Burck attempts to assert claims for trademark infringement under 15 U.S.C. § 1114 (First Cause of Action), false designation and false description under 15 U.S.C. § 1125(a) (Second and Fourth Causes of Action), and trademark dilution under 15 U.S.C. § 1125(c) (Third Cause of Action).

mark . . . ."). But, neither B&B nor the Clarence B&B Update recap of the show made any use whatsoever of those words, and Burck's claims should be dismissed.[3]

It is elementary, of course, that there can be no trademark infringement or dilution, or any other claim, based on the use of a trademark if the defendant made no use in commerce of the mark at issue. *See* 15 U.S.C. § 1114(1)(a) (directed at "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark"); *id.* §1125(a) (directed at "uses in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin"); *id.* § 1125(c) (directed at "use of a mark or trade name in commerce"); *see also, e.g., 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) ("a plaintiff must establish that . . . the defendant used the mark"). Here, B&B and the Clarence B&B Update did not use the mark "Naked Cowboy" at all, let alone make any commercial use of it. *See* Weaver Dec. Exs. A & B. Accordingly, Burck's claims that those programs violated any rights he holds to the Naked Cowboy mark fail as a matter of law. *See, e.g., 1-800 Contacts*, 414 F.3d at 406 ("Because we agree with WhenU that it does not 'use' 1-800's trademarks, we need not and do not address the issue of likelihood of confusion."); *GTFM, LLC v. Universal Studios, Inc.*, 2006 WL 1377048, *2 (S.D.N.Y. 2006) ("[P]laintiffs' FUBU marks appear nowhere in the film, and thus, plaintiffs have no claim that FUBU was used in a manner injurious to the mark and to its reputation and good will.").[4]

---

[3] Courts repeatedly have confirmed that it is appropriate to address trademark infringement and related claims on a motion to dismiss. *See, e.g., Arnold v. ABC*, 2007 WL 210330, *3 (S.D.N.Y. Jan. 29, 2007) (granting Rule 12(b)(6) motion where defendants' use of trademark was found to be a "fair use").

[4] The only trademark held by Burck identified in the Complaint is the word mark "Naked Cowboy" (*see* Compl. ¶ 16), but Burck's allegations at times appear to confuse himself with his trademark. Thus, for example, he appears to be alleging that the registered trademark Naked Cowboy was diluted not because of how defendants used the mark but because he "had no control over the manner in which Defendants depicted the Naked Cowboy in their segment." Compl. ¶ 57. To the extent that the Complaint can be construed as attempting to assert claims based on the use of Burck's image rather than his registered

Moreover, to the extent Burck's claims are aimed at the depiction of a character dressed similarly to how Burck dresses, or the use of the words "Naked Cowboy" in the title or tags describing the content of a video clip showing the character Oliver dressed similarly to Burck, those uses are permissible because (i) they do not act as designators of the source of defendants' services, and (ii) they are fully protected by the First Amendment.

## A.   Defendants Made No Trademark Usage of Anything Belonging to Burck

Courts have made clear that not every unauthorized use of a mark is actionable. *See, e.g., Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 336 (S.D.N.Y. 2000) ("'Noncommercial use of a mark,' in contrast, is not actionable . . . ."); *Yankee Publ'g, Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 272 (S.D.N.Y. 1992) ("It does not follow, however, that every unauthorized use of a protected mark is actionable.")  Rather, the Lanham Act is concerned only where a defendant has employed a plaintiff's mark as a designation of the source of defendant's own goods or services.  As a Court of Appeals observed, "[i]t is the source-denoting function which trademark laws protect, and nothing more." *Anti-Monopoly, Inc. v. Gen. Mills Fun Group*, 611 F.2d 296, 301 (9th Cir. 1979).  "If a defendant uses a trademark in a non-trademark way, the laws of trademark infringement and false designation are not implicated." *Volkswagen AG v. Dorling Kindersly Publ'g, Inc.*, 614 F. Supp. 2d 793, 808-09 (E.D. Mich. 2009).  And, "[i]f the context or manner of the use does not suggest that the trademark is being used to indicate source or origin of publication, there will be no consumer confusion." *Yankee Publ.*, 809 F. Supp. at 273; *see, e.g., Pirone*, 894 F.2d at 583 ("Whatever

---

mark, however, those claims should be dismissed because "as a general rule, a person's image or likeness cannot function as a trademark." *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 922 (6th Cir. 2003); *see, e.g., Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir. 1990) ("a photograph of a human being, unlike a portrait of a fanciful cartoon character, is not inherently 'distinctive' in the trademark sense of tending to indicate origin.").

rights Pirone may have in the mark 'Babe Ruth,' MacMillan's use of Ruth's name and
photographs can infringe those rights only if that use was a 'trademark use,' that is, one
indicating source or origin."). Thus, the Lanham Act "permits others to use protected marks in
descriptive ways, but not as marks identifying their own products." *Cosmetically Sealed Indus.,
Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997); *see, e.g., Arnold,* 2007
WL 210330, at *3 (finding non-infringing fair use where "Defendants are not using the phrase
'WHAT'S YOUR PROBLEM?' as a mark to identify or distinguish the show 'Boston Legal,' or
indicate the show's source."). In addition, the federal anti-dilution statute expressly exempts
from its reach "[a]ny noncommercial use of a mark" and "[a]ny fair use, including a nominative
or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other
than as a designation of source for the person's own goods or services." 15 U.S.C. §
1125(c)(3)(A) & (C).

Here, defendants never used either the specific words or the image of the "Naked
Cowboy" to denote the source of defendants' services. Rather, Burck complains about a brief
scene in B&B where a character dresses similarly to the way Burck clothes himself. Thus,
Burck's complaint is aimed at the content of defendants' services (*i.e.*, the content of the show,
B&B), but not at the defendants' use of a confusingly similar mark intended to identify the
source of B&B. Such a claim simply is not actionable.

For example, in *Parker v. Viacom International, Inc.*, 605 F. Supp. 2d 659 (E.D. Pa.
2009), the plaintiff asserted that the defendant's television show *The Pick Up Artist* ("TPUA")
amounted to a false designation of origin under the Lanham Act because the show used the term
"pivot" in connection with dating advice in the same manner for which plaintiff had coined that
term and used it as a trademark for his own "seduction services." The court rejected this claim,

8

among other reasons, because plaintiff's mark was used by defendant as *part* of the challenged show, not to designate the source of origin of that show: "Plaintiff's term 'pivot' is a component part of TPUA, but not the 'origin of good or service' itself. Accordingly, because Defendant's production of TPUA is the 'origin of the good' at issue, rather than Plaintiff's term 'pivot,' Plaintiff failed to satisfy the false designation of origin element." *Id.* at 666; *see, e.g., Charles Atlas*, 112 F. Supp. 2d at 338 ("DC used plaintiff's comic ad not to advance a competing product, but rather as part of a comic book storyline, to convey an idea through a literary/artistic work [*i.e.*, the defendant's comic book 'Doom Patrol']").

Likewise here, the challenged depiction of defendants' Oliver character was a component of both B&B and the Clarence B&B Update, but it did not designate the source of either. Rather, those works prominently and clearly identified the defendants as their source by including, among other things, Bell-Phillip's B&B logo in the opening and closing credits for B&B and on screen at all times during the Clarence B&B Update, *see* Weaver Dec. Exs. A & B, identifying Bell-Phillips and CBS in the closing credits for B&B, *see id.* Ex. A, and including the CBS marks with the YouTube clip. *See* Downs Dec. Ex. A & B. Thus, as the Second Circuit observed in a similar context, "[t]he non-trademark use of the challenged phrase and the defendants' good faith are both evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks." *Cosmetically Sealed*, 125 F.3d at 30.

The result is no different with respect to the titling of defendants' YouTube clip or use of the individual words "naked" and "cowboy" as tags. In both instances, the words were used to accurately describe the contents of defendants' video. The challenged title, "The Bold and the Beautiful – Naked Cowboy," accurately describes the contents of the video: a scene from B&B.

Whether one deems the use of "Naked Cowboy" in the title to connote that the video relates to a

character who looks like *a* nearly naked cowboy or who is imitating *the* "Naked Cowboy," the

title accurately describes the content of the video. Just as "[t]he use of a registered trademark on

a book cover may be a non-trademark use if the mark is merely descriptive of the book's subject

matter and the source of the book is clearly indicated," *Volkswagen*, 614 F. Supp. 2d at 809, use

of "Naked Cowboy" in the title of defendants' video clip was merely descriptive of the subject of

the clip, which clearly was identified as emanating from defendants. Defendants' use,

accordingly, was a non-infringing fair use. *See, e.g.*, *Rin Tin Tin, Inc. v. First Look Studios, Inc.*,

671 F. Supp. 2d 893, 899-901 (S.D. Tex. 2009) (finding use of "Plaintiffs' trademarked term

'Rin Tin Tin' in connection with the motion picture 'Finding Rin Tin Tin: The Adventure

Continues'" a fair use where the title related to the content of the film and "Defendants' use of a

trademarked term in the title of a film 'convey[ed] no information about the origin of the

film.'").

  Defendants' use of the individual words "naked" and "cowboy"—along with more than

thirty other single words relating to the content of their video—as "tags" on the YouTube page

that contained their video clip also was non-infringing fair use. "'[U]nless attention is drawn to

the particular word or term as being indicative of a source of origin of that product [or service],

the term is not being used as a trademark.'" *Citrus Grp., Inc. v. Cadbury Beverages, Inc.*, 781 F.

Supp. 386, 391 (D. Md. 1991). And, "[i]t is not a trademark infringement to use words in their

ordinary, rather than their special trademark, meaning." *Id.* As demonstrated by Exhibit H to the

Complaint, defendants' tags did not contain the trademarked phrase "Naked Cowboy," but used

the common words "naked" and "cowboy" for their ordinary, English-language meaning to

describe the content of defendants' own video. These two words do not denote the source of

defendants' video any more than do the words "shirtless," "underwear," "tighty," "bed," "guitar," "fashion," "designs," "Soap," "Opera," "Recap," "Oliver," "Amber," or any other of the terms also included as tags to describe the video's content. *See* Compl. Ex. H. Rather, the source is shown by the prominent "B&B" logo appearing on screen at all times. *See id.*

"Fair use" permits parties other than the trademark owner "to use protected marks in descriptive ways, but not as marks identifying their own products." *Cosmetically Sealed*, 125 F.3d at 30; *see, e.g.,* 15 U.S.C. § 1115(b)(4). Defendants' tags, like the title to defendants' video clip, are classic fair use and thus do not infringe any rights held by Burck.

**B.    Depiction of a Similarly Dressed Character and the Titling of a Video Clip Are Protected Under the First Amendment**

Even if defendants had made uses of Burck's trademark, and those uses did not qualify as fair, the challenged uses nevertheless were permissible under the First Amendment. It is fundamental that "[t]rademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 29 (1st Cir. 1987). "As a general rule, one may write fiction about virtually *any* topic, involving *any* public or private organization, corporation, or person so long as it is not defamatory." *Girl Scouts of the U.S.A. v. Bantam Doubleday Dell Publ'g Grp., Inc.,* 808 F. Supp. 1112, 1120 (S.D.N.Y. 1992) (emphasis in original), *aff'd,* 996 F.2d 1477 (2d Cir. 1993). "To prevent filmmakers, novelists, painters and political satirists from including trademarks in their works is to cordon off an important part of modern culture from public discourse." *Id.* at 1119 (internal quotation marks omitted). Thus, the Second Circuit has made plain that, in circumstances like those present here, where a trademarked term or celebrity name appears as part of an expressive work or in its title "without any overt indication of authorship or endorsement," any risk that such use of a name or mark "might implicitly suggest endorsement

11

or sponsorship to some people is outweighed by the danger of restricting artistic expression, *and the Lanham Act is not applicable.*" *Rogers v. Grimaldi,* 875 F.2d 994, 999-1000 (2d Cir. 1989) (emphasis added); *see also, e.g., Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.,* 886 F.2d 490, 495 (2d Cir. 1989) ("we hold that the *Rogers* balancing approach is generally applicable to Lanham Act claims against works of artistic expression."); *Yankee Publ'g,* 809 F. Supp. at 275 ("Even if there was some likelihood of confusion, I would still conclude that *New York's* cover did not violate Yankee's trademark rights. This is because the First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is part of the expression of a communicative message.").

Under *Rogers,* courts must construe the Lanham Act "narrowly when the unauthorized use of a trademark is made not for identification of a product origin" but for expressive purposes. *Charles Atlas,* 112 F. Supp. 2d at 335. "The *Rogers* balancing test requires courts to construe the Lanham Act to apply to artistic works *only* where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression." *Mattel, Inc. v. Walking Mountain Productions,* 353 F.3d 792, 807 (9th Cir. 2003) (internal quotation marks, emphasis in original); *see, e.g., ETW Corp.,* 332 F.3d at 928 (same); *Girl Scouts,* 808 F. Supp. at 1121 (applying "'overall balancing approach of *Rogers* and its emphasis on construing the Lanham Act "narrowly" when First Amendment values are involved'") (quoting *Cliffs Notes,* 886 F.2d at 494)). Generally, the public interest in free expression outweighs the public interest in avoiding consumer confusion. *See, e.g., Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.,* 996 F.2d 1366, 1379 (2d Cir. 1993) ("[T]o outweigh the First Amendment interest recognized in *Rogers,*" a "finding of likelihood must be particularly compelling."); *Rogers,* 875 F.2d at 1001 (evidence showed "that some members of the public would draw the incorrect inference that Rogers had

some involvement with the film.  But that risk of misunderstanding, not engendered by any overt

claim in the title, is so outweighed by the interests in artistic expression as to preclude

application of the Lanham Act."); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 340 (E.D. Pa.

1996) ("[T]he court finds as a matter of law that the Defendants' use of the plaintiff Bobby

Seale's name and likeness in connection with its promotion of the film 'Panther,' . . . is not

actionable as a violation of Section 43(a) of the Lanham Act on the grounds that the First

Amendment guarantee of freedom of expression outweighs any potential risk that the

Defendants' use of the Plaintiff's name and likeness . . . may implicitly suggest that the Plaintiff

endorsed the film or the pictorial history book.").

    The First Amendment limitation on the reach of the Lanham Act applies with full force to

Burck's claims here.  *Cf., e.g., Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981)

("Entertainment, as well as political and ideological speech, is protected; motion pictures,

programs broadcast by radio and television, and live entertainment, such as musical and dramatic

works fall within the First Amendment guarantee.").  The law is clear: "in deciding the reach of

the Lanham Act in *any case where an expressive work is alleged to infringe a trademark*, it is

appropriate to weigh the public interest in free expression against the public interest in avoiding

consumer confusion." *Cliffs Notes*, 886 F.2d 494 (emphasis added).  Here, Burck challenges an

expressive work, namely the depiction of a "character by the name of 'Oliver'" in an episode of a

fictional "soap opera drama."  Compl. ¶¶ 21-24.  This use is precisely of the type for which

*Rogers* found "the Lanham Act is not applicable." 875 F.2d at 1000.

    *Rogers* involved Lanham Act and right of publicity claims asserted by the famed

performer Ginger Rogers against the producers and distributors of the movie titled "Ginger and

Fred." *Id.* at 996.  The movie "tells the story of two fictional Italian cabaret performers" who

"imitated Rogers and [Fred] Astaire." *Id.* at 996-97. As the court observed, "[t]he film is manifestly not about Rogers. It is about a pair of fictional characters who are like Rogers and Astaire only in their imagination." *Id.* at 1005. Rejecting Rogers' claims, the court recognized that there was some evidence of confusion resulting from the defendants' use of the title "Ginger and Fred," but "that risk of misunderstanding . . . is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act." *Id.* at 1001.

Here, similar to the facts of *Rogers*, B&B is manifestly not about Burck. It contains a storyline in which a fictional character at most could be viewed as imitating the Naked Cowboy. Moreover, like the title "Ginger and Fred," use of the words "Naked Cowboy" in the YouTube clip titled "The Bold and the Beautiful – Naked Cowboy" had artistic relevance to the content of that video clip featuring a character dressing like the Naked Cowboy and did not explicitly mislead as to the source or content of that video.[5] Thus, as in *Rogers*, any risk of confusion arising from defendants' works is outweighed by the interests in artistic expression, and the Lanham Act does not apply.

## C.   Defendants' Activities Pose No Likelihood of Confusion

There is some uncertainty as to whether, in the context of First Amendment expressive works, it even is necessary to consider whether a defendant's work creates a likelihood of confusion. As one court observed,

> As noted in *Cliffs Notes*, the approach adopted by the Second Circuit in *Rogers* "takes into account the ultimate test in trademark law, namely, the likelihood of confusion 'as to the source of the goods in question.'" However, in neither *Cliffs Notes* nor *Rogers*

---

[5] In *Rogers*, the Second Circuit provided examples of what would constitute explicitly misleading title designations, such as "Nimmer on Copyright" or "Jane Fonda's Workout Book" where the named person had nothing to do with the project, or a subtitle falsely stating "an authorized biography." 875 F.2d at 999. Defendants' title here, of course, contains none of the elements suggested as misleading by the Second Circuit.

> did the Second Circuit explicitly employ the *Polaroid* factors in
> weighing the trademark rights of the plaintiffs against the First
> Amendment implications of artistic expression.

*Girl Scouts*, 808 F. Supp. at 1121-22 (citations omitted).  Nevertheless, some courts have

continued to apply the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d

492, 495 (2d Cir. 1961) to assess whether a likelihood of confusion is present.  *See, e.g., Girl*

*Scouts*, 808 F. Supp. at 1122.  Doing so here demonstrates there is absolutely no likelihood of

confusion posed by defendants' works, much less the "particularly compelling" finding of

confusion demanded by *Rogers.  Twin Peaks*, 996 F.2d at 1379.

1.    Plaintiff's Mark is Exceedingly Weak

The first factor examines the strength of a plaintiff's mark both from the perspective of

the mark's inherent strength and from any acquired distinctiveness.  *E.g., The Deal, LLC v.*

*Korangy Publ'g, Inc.*, 309 F. Supp. 2d 512, 525 (S.D.N.Y. 2004).  Ultimately, the "strength" of a

trademark is its "tendency to identify the goods sold under the mark as emanating from a

particular ... source." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995)

(internal quotation marks omitted).  Under the classification scheme used in the Second Circuit,

"Naked Cowboy" is descriptive of Burck's services and thus it is inherently weak.  *See, e.g.,*

*Windsor, Inc. v. Intravco Travel Centers, Inc.*, 799 F. Supp. 1513, 1522 (S.D.N.Y. 1992)

("Descriptive marks are considered inherently weak . . . .").  A mark is descriptive when it

"clearly 'imparts information directly'" about the goods or services with which it is used.

*M.B.H. Enters. Inc. v. WOKY, Inc.*, 633 F.2d 50, 55 (7th Cir. 1980); *see also, e.g., Girl Scouts,*

808 F. Supp. at 1123 ("A descriptive term 'conveys an immediate idea of the ingredients,

qualities or characteristics of the goods.'").  As Burck's Complaint asserts, the services he

provides are "to meet and greet the public in New York City's Times Square" while "he dresses

as a cowboy—only a virtually Naked one." Compl. ¶ 9. The term "Naked Cowboy" thus describes an aspect of Burck's services and is a weak mark.

      2.    The Parties' "Marks" Are Not Similar in Context or Impression

The second *Polaroid* factor analyzes the similarity between the parties' marks. Applying this factor, courts look to "the overall impression" created by the marks and the "context in which they are found." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993). Here, B&B and the Clarence B&B Update make no use whatsoever of the "Naked Cowboy" mark, so there is, of course, no similarity between the parties' use of the mark at issue. Moreover, defendants' use of the words "Naked Cowboy" in connection with their YouTube video was unmistakably as part of a *title* identifying a particular work, and did not identify the *source* of that particular work. And, the words were not used standing alone, but comprised only a portion of the full title "The Bold and the Beautiful – Naked Cowboy." This conveys an entirely different impression from Burck's use of the designation "Naked Cowboy" standing alone, hand-painted on his hat, underwear and guitar. Beyond the obvious differences between use as a title and use as a source designator, "the Second Circuit has held that the defendant's use of its own well-known mark would ensure that the goods at issue would be associated with the defendant and not the plaintiff." *Girl Scouts*, 808 F. Supp. at 1125 (internal quotation marks omitted). Here, CBS's own famous logo was prominently displayed just below the challenged title on the YouTube page and at the end of the video. *See* Downs Dec. Exs. A & B.

Likewise, the context and impression of defendants' YouTube "tags" are completely dissimilar to Burck's usage. In contrast to the capitalized phrase "Naked Cowboy" used by

Burck, the tags consist of the separate lowercase words "naked" and "cowboy" included among a lengthy list of other descriptive words.[6]

### 3. The Parties' Goods and Services Are Not Competitively Proximate

The next factor "concerns whether and to what extent the two products compete with each other." *Chum Ltd. v. Lisowski*, 198 F. Supp. 2d 530, 538 (S.D.N.Y. 2002); *see, e.g.*, *Lemme v. NBC*, 472 F. Supp. 2d 433, 448 (E.D.N.Y. 2007) ("This factor focuses on whether the two products compete with each other.").

Burck "meet[s] and greet[s] the public in New York City's Times Square," Compl. ¶ 9, and licenses his trademark for use in connection with shellfish distributed "throughout New York," and t-shirts, postcards, key chains, pencils, and the like, sold by "vendors throughout New York City." *Id.* ¶¶ 18-19. The audience for Burck's services is primarily limited to the New York City area, as Burck's website declares: "NAKED COWBOY has been in TIMES SQUARE every single day for over 10 YEARS." Penchina Dec. Ex. A. Defendants provide none of the goods or services provided by Burck. Rather, defendants' offerings are a famous televised daytime serial and videos relating to that daytime serial. In contrast to the sale of items by vendors and the in-person delivery of Burck's services to people in Times Square, B&B is broadcast to a national television audience via the CBS Television Network. Compl. ¶ 21. Although Burck has appeared on a number of television shows as "Himself," Compl. Ex. B, he is not the originator or source of those shows but merely made appearances as a guest. Moreover,

---

[6] To the extent Burck's claim is based on how the Oliver character was dressed, Oliver's appearance is dissimilar in context and impression from Burck's appearance. Burck's white cowboy hat prominently displays the words "Naked Cowboy" in hand-painted red and blue letters, as does his briefs. *See* Penchina Dec. Exs. A - C. Likewise, the words "Naked Cowboy" are painted across the front of his white or blue guitar, and his light-colored boots display the word "Tips" or a dollar sign. *See id.* Exs. A & B. In contrast, Oliver's tan hat, brown boots, light-brown guitar, and underwear have no wording whatsoever, and nowhere display the words "Naked Cowboy" that are so prominently and repeatedly featured on Burck's costume.

Burck simply does not market any service in competition with defendants' daytime television "drama soap opera." *Id.* ¶ 21. Rather, Burck and defendants "occupy 'distinct merchandising markets.'" *Charles Atlas*, 112 F. Supp. 2d at 339 (quoting *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996)). Thus, this factor weighs against finding confusion. *See, e.g., Western Publ'g Co. v. Rose Art Indus., Inc.*, 910 F.2d 57, 62 (2d Cir. 1990) ("[I]t is undisputed that Western does not currently market a product directly competitive with Rose Art's GoldenSlate. The third *Polaroid* factor – proximity of the products – therefore weighs heavily in favor of Rose Art."), *superseded on other grounds by Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577 (2d Cir. 1993).

### 4.  Burck Will Not "Bridge the Gap"

This factor assesses the likelihood that the senior user of a mark will expand its use of the mark into the same market occupied by the junior user. *E.g., Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991). There is nothing in the Complaint to even remotely suggest any ability or intent of Burck to offer "a thirty (30) minute daytime drama soap opera . . . air[ing] on a major U.S. Television Network." Compl. ¶ 21. Any assertion to the contrary would be utter speculation and simply implausible. *See, e.g., 24 Hour Fitness USA, Inc. v. 24/7 Tribecca Fitness, LLC*, 447 F. Supp. 2d 266, 277 (S.D.N.Y. 2006) ("[s]peculative intentions do not demonstrate that bridging the gap is likely"), *aff'd*, 247 F. App'x 232 (2d Cir. 2007); *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 297 (S.D.N.Y. 2003) ("Any future intention to bridge the gap is merely speculative. Thus, this factor weighs in favor of the defendants.").

### 5.  There Has Been No Actual Confusion

Although Burck alleges that defendants' show is *likely* to cause confusion, the Complaint is utterly devoid of any assertion that any confusion actually has occurred. There has been none.

6.      Defendants Acted In Good Faith

As the Second Circuit instructed, a "defendant['s] good faith [is] evidenced by the fact that the source of the defendant['s] product is clearly identified by the prominent display of the defendant['s] own trademarks." *Cosmetically Sealed*, 125 F.3d at 30.  Here, defendants' own marks are prominently displayed in connection with all of the uses challenged by Burck.  *See* Weaver Dec. Exs. A & B; Downs Dec. Exs. A & B.  Moreover, courts have made clear that "[s]election of a mark that reflects the product's characteristics" is a factor "that support[s] a finding of good faith." *Lang*, 949 F.2d at 583.  As previously discussed, inclusion of the words "naked cowboy" in the title "The Bold and the Beautiful -- Naked Cowboy" was artistically relevant to the content of defendants' video.

7.      Defendants' Services Are of the Highest Quality

"Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." *Gruner + Jahr*, 991 F.2d at 1079.  There is no such allegation made here. Burck contends he is not happy with the communicative message of B&B, but there simply is no basis to impugn the quality of the show—winner for the last two years of the Emmy Award for best drama series—or contend that the reputation of Burck's street performances, oysters, pencils, or other items would be the slightest bit harmed if B&B's reputation for quality became attached to them.

8.      Defendants' Services Are Targeted at a Sophisticated Audience

"The final Polaroid factor, the sophistication of the consumers, is grounded on the belief that unsophisticated consumers aggravate the likelihood of confusion." *Windsor*, 799 F. Supp. at 1526.  The Complaint does not allege facts directly addressing the sophistication of the audiences for the parties' services.  Even assuming *arguendo* that the audiences are

unsophisticated, however, the nature of the parties' services are such that even unsophisticated

audiences will not be confused.  For example, in *Lemme*, 472 F. Supp. 2d at 433, the court

considered trademark claims asserted by the producer of a local cable television program against

a major network arising in connection with two television shows that bore the same title.

Although there was "no evidence in the record as to the sophistication of either programs'

viewers," the court concluded that: "Given the stark differences between the two programs, even

an ordinary consumer is unlikely to be confused." *Id.* at 451 & n.11; *see Motown Prods., Inc. v.

Cacomm*, 668 F. Supp. 285, 291-92 (S.D.N.Y. 1987) (addressing trademark claim relating to

television show, and assuming that the viewers "'be considered as essentially unsophisticated,'"

the court found: "The two programs, however, are so different in content and quality that there is

no likelihood of confusion even among ordinary television viewers."), *rev'd on other grounds*,

849 F.2d 781 (2d Cir. 1988); *see also, e.g., Chum Ltd.*, 198 F. Supp. 2d at 541 ("[W]hile there

undoubtedly is a spectrum of sophistication among the parties' viewers, the court finds that the

average consumer is sophisticated enough to understand, at a minimum, the difference between a

television program and a television channel."). So too here. Even if one assumes that the

viewers of B&B are unsophisticated consumers, there is no likelihood that they would confuse

Bell-Phillip's award-winning production as emanating from the same source as Burck's street

performances, trinkets or shellfish.

       9.     <u>Balancing the Factors Demonstrates No Likelihood of Confusion</u>

      Because Burck challenges defendants' expressive works, a "finding of likelihood of

confusion must be particularly compelling." *Twin Peaks*, 996 F.2d at 1379. Here, it is not. Not

one of the *Polaroid* factors weighs in favor of finding a likelihood of confusion. Thus, assuming

the truth of all of Burck's allegations, his Complaint fails to establish any likelihood of confusion

arising from defendants' offerings, and all of his Lanham Act claims are barred by the First Amendment.

## II.   BURCK DID NOT AND CANNOT STATE A CLAIM UNDER STATE DECEPTIVE PRACTICES OR FALSE ADVERTISING LAW

Burck's Fifth, Sixth and Ninth Causes of Action purport to assert claims under New York General Business Law sections 349, 350 and 360-l that mirror his Lanham Act claims. These counts fail to state a claim for the same reasons that Burck's Lanham Act claims are fatally defective.

As courts have made clear, the "general doctrines developed by Federal and New York cases related to trademark infringement and unfair competition are virtually identical." *Corning Glass Works v. Jeannette Glass Co.*, 308 F. Supp. 1321, 1327-28 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970). "'[New York] State law largely tracks federal law in this area . . . .'" *Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.*, 2009 WL 4857605, *3 (S.D.N.Y. 2009) (quoting *Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 410 (S.D.N.Y. 2006)). Thus, "[t]he federal standards applicable to false advertising claims are substantially similar to the standards applicable to claims under the New York deceptive trade practices statute." *Nomination di Antonio*, 2009 WL 4857605, at *3, n.3; *see also, e.g.*, *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006) (stating "[w]e analyze claims under New York's unfair competition statute in a similar fashion to how we analyze claims under the Lanham Act" when addressing claim for "injury to business reputation under N.Y. Gen. Bus. Law § 360-l"); *Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp 1060, 1063 (S.D.N.Y. 1991) (examining federal and state trademark and unfair competition claims together because elements "are substantially the same."); *Merck & Co.*, 425 F. Supp. 2d at 410, n.6 (noting that standards for bringing a claim under 15 U.S.C. § 1125(a)

21

"'are substantially the same as those applied to claims brought under . . . §§ 349 and 350 of the New York General Business Law.'") (quoting *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 800 (S.D.N.Y. 1997)). Moreover, "the same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law." *Yankee Publ'g*, 809 F. Supp. at 282.

Thus, Burck's claims under the New York General Business Law are without merit and should be dismissed for the same reasons discussed above concerning his defective Lanham Act claims. *See, e.g., Charles Atlas*, 112 F. Supp. 2d at 341 ("Plaintiff's pendent state law claims under New York's . . . deceptive trade practices statute . . . are likewise dismissed because they are based on the same permissible conduct [challenged under the Lanham Act]").

## III.   BURCK'S CLAIM UNDER NEW YORK CIVIL RIGHTS LAW §§ 50 and 51 IS FRIVOLOUS

Burck's Seventh Cause of Action purports to assert a claim for violation of Sections 50 and 51 of the New York Civil Rights Law based on his assertion that defendants "misappropriated the Naked Cowboy brand." Compl. ¶ 68. In making this claim, Burck ignores that a court in this district recently rejected similar claims made by him because "the New York statute protects the name, portrait, or picture of a 'living person,' not a character created or a role performed by a living person." *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 448-49 (S.D.N.Y. 2008).

In that case, Burck alleged that his right of privacy or publicity was violated when Mars, Inc. ran a promotion for its M&M candies which included a depiction of an M&M candy character "dressed up exactly like the Naked Cowboy—white underwear, white cowboy hat, white cowboy boots, and white guitar." *Id.* at 449. Rejecting Burck's claim, the court stated that:

> [D]efendants did evoke certain aspects of the character created by
> Burck, and they copied The Naked Cowboy's costume, but these
> actions *were not prohibited by sections 50 and 51*.  Merely evoking
> certain aspects of another's character or role does not violate
> sections 50 and 51. . . . The plain language of the Civil Rights Law
> makes it clear that the statutory right to privacy *does not extend to*
> *fictitious characters adopted or created by celebrities.*  Section 51
> protects "any person," and section 50 limits the statutory protection
> to "any living person."  The Naked Cowboy is not a living person,
> but a character Burck takes on when performing.  The privacy
> statutes were not intended to protect a trademarked, costumed
> character publicly performed by a person.

*Id.* at 453-54 (emphasis added, citations omitted).  Here, just as in *Mars*, Burck's own likeness

was not used; rather, he complains that a character in B&B dressed like him and exploited his

"persona."  Compl. ¶ 69.  In view of *Mars*, Burck should have been well aware that there simply

is no legal basis for this claim.

   Even if Burck's own likeness had been used, however, Burck still cannot state a claim

under Sections 50 and 51.  Section 51 of the New York Civil Rights Law authorizes a claim by

"[a]ny person whose name, portrait, picture or voice is used within this state *for advertising*

*purposes or for the purposes of trade.*"  N.Y. Civ. Rights Law §51 (emphasis added).  Section 51

does not give rise to a cause of action merely because someone is not happy about how he has

been shown in an expressive work.  It only applies to uses of a person's name or likeness in a

"purely commercial setting."  *Arrington v. N.Y. Times Co.*, 55 N.Y.2d 433, 442, 449 N.Y.S.2d

941, 945 (1982).  Thus, the New York State Court of Appeals repeatedly has "underscored that

the statute [Section 51] is to be narrowly construed and strictly limited to nonconsensual

*commercial* appropriations of the name, portrait or picture of a living person."  *Messenger ex rel.*

*Messenger v. Gruner + Jahr Printing & Publ'g*, 94 N.Y.2d 436, 441, 706 N.Y.S.2d 52, 55

(2000) (emphasis added, quotation marks omitted).  Courts have repeatedly made clear that

"works of fiction . . . do not fall within the narrow scope of the statutory phrases 'advertising'

and 'trade'" and uses of persons' likenesses in such works are not actionable. *Hampton v. Guare*, 195 A.D.2d 366, 366, 600 N.Y.S.2d 57, 58 (1st Dep't 1993); *see also, e.g., Walter v. NBC Television Network*, 27 A.D.3d 1069, 1070, 811 N.Y.S.2d 521, 522 (4th Dep't 2006) (Section 51 is "strictly limited to nonconsensual commercial appropriation," and does not apply to segment of *The Tonight Show*) (internal quotation marks omitted); *Costanza v. Seinfeld*, 279 A.D.2d 255, 255, 719 N.Y.S.2d 29, 30 (1st Dep't 2001) (rejecting claim based on character in television program *Seinfeld* because "works of fiction do not fall within the narrow scope of the statutory definitions of 'advertising' or 'trade.'"); *Lemerond v. Twentieth Century Fox Film Corp.*, No. 07 Civ. 4635, 2008 WL 918579, *3 (S.D.N.Y. 2008) (use of person's likeness in the movie *Borat* "is not actionable under NYCRL § 51."). Likewise, Sections 50 and 51 do not apply to Burck's claim here directed at defendants' show.

## IV.   BURCK'S FRAUD CLAIM IS FRIVOLOUS

Burck's Eighth Cause of Action, purporting to assert a claim for fraud, not only fails to meet the specificity requirements of Fed. R. Civ. P. 9(b), but fails to establish any of the elements needed to state a claim for fraud. Burck's claim is not based on any allegedly false statement made to him upon which he relied to his detriment; instead, Burck asserts that the defendants' alleged "use of the Naked Cowboy image" supposedly "caused the public to be deceived." Compl. ¶ 71.

"The elements of fraud under New York law are: '[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury.'" *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). Here, the complaint fails, among other things, to identify any misrepresentations made to Burck, what Burck did in reliance on those misrepresentations, and

24

how he was harmed as a result of having relied on any misrepresentation by defendants. Moreover, even if Burck could identify anything he did in reliance on defendants' alleged misrepresentation, any such reliance on his part simply could not be justifiable. The fraudulent statement Burck alleges had been communicated was that defendants misled viewers "into believing that [B&B's Oliver] character was indeed the Naked Cowboy or had the support, sponsorship or endorsement of the Naked Cowboy." Compl. ¶ 71.. Thus, Burck's "fraud" claim is duplicative of and subsumed by his non-actionable trademark and unfair competition claims. Moreover, even if this supposed message was communicated to Burck himself, Burck certainly knew that Oliver was not him, and that he had not sponsored or otherwise endorsed B&B. Thus, to the extent Burck might have relied in any way on the purported communication from defendants, such reliance could not have been justifiable, and Burck cannot state a claim for fraud.

## CONCLUSION

For all the foregoing reasons, defendants respectfully request that this Court grant their motion to dismiss the Complaint in its entirety, and grant defendants their costs in connection with this motion together with such other relief the Court deems just and appropriate.

Dated:   New York, New York          Respectfully submitted,
         March 31, 2011

                                      LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.


                                      /s/Robert Penchina
                                      Robert Penchina
                                      321 West 44th Street, Suite 510
                                      New York, NY 10036
                                      (212) 850-6100
                                      (212) 850-6299 (Fax)

                                      *Attorneys for Defendants*

25